UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


ROGER D. BECKNER

     Plaintiff

v.                                    Civil Action No.: 2:05-0530

BAYER CROPSCIENCE, LP,

     Defendant


MEMORANDUM OPINION AND ORDER


       Pending is defendant's motion for summary judgment filed June 9, 2006.[1]  Defendant asserts that this action is both time barred and lacking proof respecting four necessary statutory elements.[2]

---

[1]On October 27, 2006, the court stayed this action pending the outcome of plaintiff's worker's compensation claim. Discovery in the case, which commenced September 23, 2005, appears to have continued until at least the Fifth Supplemental Expert Witness Disclosure served by defendant over two years later on November 7, 2007.

     On July 14, 2009, the court was advised by counsel of the final disposition of the worker's compensation claim.  Following the submission of supplemental briefing and notices of supplemental authority, the last of which was received June 15, 2010, the court concludes the stay is no longer necessary.  The court, accordingly, ORDERS that the stay be, and it hereby is, lifted.

     [2]The parties have each moved for leave to exceed the page limitation for their respective legal memoranda.  Plaintiff has moved to file a surreply.  The court ORDERS that all three motions be, and they hereby are, granted.

I.


From 1985 to 1999, plaintiff Roger D. Beckner worked at
Rhone-Poulenc's Institute chemical plant ("plant").   The parties
agree that defendant Bayer Cropscience, LP ("Bayer") is Rhone-
Poulenc's successor for all purposes.


In 1994, Dr. Kuruvilla John diagnosed Beckner with
peripheral neuropathy.   The disease causes numbness, tingling,
burning, and pain in the feet and hands.   There is a slow onset
of symptoms.   The condition arises from multiple sources,
including diabetes, inherited illnesses, and exposure to toxins
such as the industrial solvent n-hexane ("hexane").
Additionally, chemicals such as methyl isobutyl ketone ("MIBK")
can work synergistically with hexane and significantly increase
the chances of developing  the disease.   Beckner was exposed to
both hexane and MIBK while working at the plant.


Dr. John diagnosed Beckner in the disease's early
stages.   Dr. John was, however, unable to determine its cause.
He subsequently referred Beckner to Dr. John Kissel, who also
failed to ascertain the disease's source.


In December 1994, Beckner underwent an annual company
physical.   He mentioned his diagnosis to Dr. Bipin Avashia, the

company doctor who examined him.  At that time, Dr. Avashia knew
(1) that hexane could cause peripheral neuropathy; (2) that
Beckner was exposed to hexane in his work; (3) that the cause of
Beckner's peripheral neuropathy had yet to be determined; and (4)
that some chemicals can advance the development of peripheral
neuropathy when accompanied by hexane exposure.  Through 1998 Dr.
Avashia conducted Beckner's annual company physicals.  He never
informed Beckner of the possible link between the disease and
Beckner's workplace hexane exposure.  Beckner states that he
would have bid on a job without chemical exposure had Dr. Avashia
appropriately cautioned him.

On February 12, 1999, Beckner ceased work due to his
worsening neurological symptoms.  It is undisputed that his
disease precludes him from his former job at the plant.  The same
year that Beckner left the plant, one of his former coworkers,
trained in another unit at the plant, showed him a Materials
Safety Data Sheet ("MSDS").  The MSDS linked peripheral
neuropathy to hexane exposure.  This was Beckner's first
indication of a connection between his disease and a potential
causative agent found in his former workplace.

Dr. John subsequently referred Beckner to the Johns
Hopkins Hospital.  On May 11, 1999, Beckner saw Dr. Tony Ho

3

there.  Beckner conferred with Dr. Ho about the MSDS sheets.  In an October 29, 1999, clinic note, Dr. Ho agreed that hexane could have caused Beckner's disease.  He was unable to definitively so conclude.  He performed objective medical testing, including a June 15, 1999, sural nerve biopsy.  It was inconclusive.  He also conducted a study that set a baseline from which future medical providers could determine the progression of Beckner's condition.[3]

In 2001, Beckner returned to Johns Hopkins Hospital. He was placed under the care of Dr. John Griffin, who chaired the Department of Neurology.  After the examination, Dr. Griffin wrote to Beckner's family physician.  The September 1, 2001, letter stated as follows:

> [Beckner's] nerve biopsy showed none of the charac-
> teristic pathology [of hexane induced neuropathy].  He
> has had a worsening of the symptoms in the past, but
> since his last visit, his symptoms have stabilized. . .
>
> I are [sic] unable to definitively say that this is
> secondary to n-hexane.  I have indicated to him that if it
> were there should be continued improvement.  At present I
> consider the diagnosis the most probable, but I cannot be
> definitive.
>
> He will return in a few months to us to reassess.  As time
> goes on the possibility of identifying improvement that

_____

[3]The record reflects that peripheral neuropathy caused by chemical exposure often stabilizes or improves.  A phenomenon described as "coasting" can occur.  That term describes disease progression despite discontinued exposure.

4

would support an earlier toxic exposure increases.
(Griffin Ltr. (Sept. 1, 2001, Ex. I to Def.'s Memo.)

Beckner heeded Dr. Griffin's advice to visit Dr. Alan
Ducatman at the West Virginia University Department of
Occupational and Environmental Health. In November 2001 Dr.
Ducatman evaluated Beckner. He concluded that Beckner's disease
was "certainly compatible with n-hexane peripheral neuropathy."
(Ducatman report, dated November 26, 2001, Def.'s Ex. J.) He
offered no conclusive etiology: "[T]he present available
[employment] history is not consistent with the kinds of
exposures that usually cause these outcomes."[4] (Id.)

On November 12, 2002, Beckner returned to Johns Hopkins
Hospital. After performing further studies at that time, Dr.
Griffin intended to author a clinic note fixing the source of
Beckner's disease as "probable hexacarbon neuropathy." (Griffin
Depo. at 145, attached as Ex. K to Def.'s Memo); Clinic Note at

---

[4]Dr. Ducatman, in turn, offered an additional referral that
he appears to have deemed the best hope for certainty: "if
[Beckner] want[s] to get the most informed opinion about hexane
peripheral neuropathy . . . we would refer . . . [him] to Dr.
Schaumberg [sic] at Albert Einstein School of Medicine in the
Bronx [sic]." (Ducatman report, dated November 26, 2001, Def.'s
Ex. J.) Once again, Beckner continued his quest, visiting Dr.
Schaumburg and an associate, Dr. Herskovitz. These experts
concluded that it was more likely that Beckner's illness resulted
from exposure to hexane and MIBK at the Institute plant.

2, attached as  Ex. 8 to Pl.'s Resp. Memo.)   The clinic note was

not signed until May 31, 2003.  It states in its first paragraph

that "[t]his is a redaction of his note from 11/12/02 which [Dr.

Griffin] failed to record or was otherwise lost." (Clinic Note at

1.)  Beckner says that he did not receive word of the causal link

until June 5, 2003.[5]

        In June 2003, Beckner sought workers' compensation

benefits.  The claim was deemed compensable by the Workers'

Compensation Board of Review.  On July 10, 2009, that

administrative decision became final when the Supreme Court of

Appeals of West Virginia denied review.  Beckner highlights a key

aspect of the administrative process, namely, Dr. Avashia's 2004

deposition.  Dr. Avashia stated therein that he knew (1) that

hexane was associated with peripheral neuropathy, (2) that

Beckner suffered from the condition, with its origin unknown, and

(3) that Avashia did nothing to investigate further.

        On May 26, 2005, Beckner instituted this action in the

Circuit Court of Kanawha County.  He asserts a deliberate-

intention claim pursuant to W. Va. Code § 23-4-2(c)(2).  On June

---

[5]In support of this late receipt, Beckner cites Dr.
Griffin's deposition testimony mentioning that the note "went out
. . . [in] May 2003."  (Griffin Depo. at 150, attached as Ex. K
to Def.'s Memo.)  Beckner's time line is acceptable.  Assuming
the note was mailed the same day it was signed, namely, May 31,
2003 (a Saturday), June 5, 2003, is a reasonable date of receipt.

29, 2005, Bayer removed.  As noted, it now seeks summary judgment, asserting that the claim (1) is time barred, and (2) lacking proof on the first four statutory elements.

II.

A.   Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-

7

movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

B.   Limitations Analysis

A two-year limitations period governs Beckner's deliberate-intention claim. Hamilton v. Pilgrim's Pride Corp., 314 F. Supp.2d 630, 635 (N.D. W. Va. 2004)("the two-year statute of limitations set forth in W. Va. Code § 55-2-12(b) is the statute of limitations applicable to a deliberate intent action brought under the Workers' Compensation Act"). The proper application of the discovery rule is central to the parties' dispute.

Typically a claim accrues when the corresponding tort occurs. The discovery rule tolls the clock, however, until the injured party "knows or by reasonable diligence should know of his claim." Gaither v. City Hospital, Inc., 199 W. Va. 706, 711,

8

487 S.E.2d 901, 906 (1997).  The policy concern underlying the rule is "the inherent unfairness of barring a claim when a party's cause of action could not have been recognized until after the ordinarily applicable period of limitation."  <u>Harris v. Jones</u>, 209 W. Va. 557, 562, 550 S.E.2d 93, 98 (2001).

Following receipt of the parties' supplemental briefing, the supreme court of appeals decided <u>Dunn v. Rockwell</u>, 225 W. Va. 43, 689 S.E.2d 255 (2009).  The decision in <u>Dunn</u> sets forth a "five-step analysis" to ascertain if an action is time barred:

> First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred.  Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of <u>Gaither v. City Hosp., Inc.</u>, 199 W. Va. 706, 487 S.E.2d 901 (1997). Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine. Only the first step is purely a question of law; the resolution of steps two through five will generally involve

9

> questions of material fact that will need to be
> resolved by the trier of fact.

Dunn, 225 W. Va. at 46, 689 S.E.2d at 258.

At step one, as noted, a two-year limitations period applies. Steps two and three merge somewhat. Step two involves a determination of when the requisite elements of the deliberate-intention claim occurred. Step three involves claim accrual, namely, when plaintiff knew, or by the exercise of reasonable diligence should have known, that the claim's elements were satisfied. Each step thus requires an understanding of the elements of the deliberate-intention claim, which are set forth below and discussed in greater detail in section II.B.2:

> (A) That a specific unsafe working condition existed in
> the workplace which presented a high degree of risk and
> a strong probability of serious injury or death;

> (B) That the employer had a subjective realization and
> an appreciation of the existence of the specific unsafe
> working condition and of the high degree of risk and
> the strong probability of serious injury or death
> presented by the specific unsafe working condition;

> (C) That the specific unsafe working condition was a
> violation of a state or federal safety statute, rule or
> regulation, whether cited or not, or of a commonly
> accepted and well-known safety standard within the
> industry or business of the employer, which statute,
> rule, regulation or standard was specifically
> applicable to the particular work and working condition
> involved, as contrasted with a statute, rule,
> regulation or standard generally requiring safe
> workplaces, equipment or working conditions;

10

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless thereafter exposed an employee to the specific unsafe working condition intentionally; and

(E) That the employee exposed suffered serious injury or death as a direct and proximate result of the specific unsafe working condition.

Riffle v. C.J. Hughes Const. Co., No. 35521, --, W. Va. --, --, -- S.E.2d --, --, 2010 WL 4394291, at *2 (Nov. 1, 2010) (quoting W. Va. Code § 23-4-2(d)(2)(ii)).[6]

The parties' respective limitations arguments center on analysis of steps two and three as they relate to the first and fifth deliberate-intention elements.  In sum, the question appears to be when Beckner knew, or in the exercise of reasonable diligence should have known, that a specific unsafe working condition to which he was exposed at the plant directly and proximately caused his disease.

Bayer offers two accrual dates.  The first is October 29, 1999.  That is when Dr. Ho concluded that hexane exposure could have caused Beckner's disease.  The second is September 1, 2001.  That is when Dr. Griffin wrote Beckner's family physician

_____

[6]The parties agree that this version of the deliberate intention statute, effective July 1, 2003, governs rather than the more recent July 1, 2005, version.  (Pl.'s Memo. at p. 28, n.30.)

11

and equivocally stated that hexane-induced peripheral neuropathy
was the "most probable" diagnosis.

The October 29, 1999, date does not work.  At that
point Dr. Ho ventured only that hexane exposure could cause
peripheral neuropathy.  That is far removed from concluding to a
reasonable degree of medical probability that hexane exposure was
the root cause of Beckner's affliction.  Bayer implicitly
concedes as much.  (See Def.'s Memo. at 22 (recognizing that Dr.
Ho had found "unrevealing pathology results from the sural nerve
biopsy.")).

The September 1, 2001, date is equally infirm.  The
clinic note authored by Dr. Griffin on that date stated only that
he then considered the diagnosis "most probable."  Reasonable
fact finders would differ about the meaning of most probable, a
phrase fraught with ambiguity.  The uncertainty is heightened
further  when the phrase is considered in context.  After noting
that Beckner's nerve biopsy showed none of the characteristic
pathology of hexane-induced neuropathy, Dr. Griffin stated that
he was unable to definitively say that it was secondary to
hexane exposure.  He then added:

> He will return in a few months to us to reassess.  As time
> goes on the possibility of identifying improvement that
> would support an earlier toxic exposure increases.

12

If Dr. Griffin's contemporaneous equivocation does not suffice,

his subsequent deposition testimony makes matters quite clear:

> Q.  Do you recall that Mr. Beckner was asking you
> whether or not, at various times, you would sign a form
> for worker's compensation?
>
> A.  That's correct.
>
> Q.  You were not, as I recall, willing to do that
> initially.
>
> A.  That's correct.
>
> Q.  There came a time, and you can change the word if
> you want, but your level of confidence in the diagnosis
> reached the level where you were willing to sign a
> worker's compensation form.
>
> A.  That is correct.
>
> Q.  When was that?
>
> A.  It was after the visit in November 2002.

(Griffin Depo. at 149.)  Indeed, Bayer's own expert, Dr.

Christopher Martin, characterizes Dr. Griffin's "most probable"

comment as meaning "that . . . hexane was the only potential

cause . . . [Dr. Griffin] could identify, . . . [and not] that it

rose to the level of more probable than not."  (Martin Report at

pg. 4, attached as Ex. Q to Def.'s Memo.)

        Viewed in light of the totality of the circumstances,

one cannot conclude as a matter of law that the September 1,

2001, clinic note commenced the limitations clock.  A jury is

better suited to determine if Dr. Griffin was speaking in terms
of medical probability.

Inasmuch as neither date offered by Bayer serves as a
legally conclusive accrual date, it is not entitled to judgment
as matter of law on its limitations defense.[7]

C.   Deliberate-Intention Analysis

The typically exclusive nature of state workers'
compensation systems is well settled: "the right of the injured
employee to workmen's compensation has been substituted in lieu
of his cause of action against the negligent employer and this
remedy of compensation is an exclusive remedy." J.H. Fletcher &
Co. v. Allied Chemical Corp., 498 F.Supp. 629, 630 (S.D. W. Va.
1980).  An employer's immunity from employee tort liability is
not, however, absolute.  An employer risks suit when it acts
"with 'deliberate intention'" in satisfaction of the five

---

[7]Bayer also seeks to disqualify Beckner's lawyers.  It
claims they are material witnesses obliged to testify about their
state of mind on limitations matters during the years prior to
instituting this action.  An order compelling counsel to testify
on that matter would likely offend both the work-product and
attorney-client privileges.  In any event, the discovery-rule
analysis is aimed toward Beckner's reasonable diligence and not
that of his lawyers.  The contention is without merit.

earlier-stated statutory elements found in West Virginia Code section 23-4-2(c)(2).  Four of those five elements are now analyzed in light of the evidentiary record developed by the parties.

### 1. Specific Unsafe Working Condition

Beckner must first demonstrate "[t]hat a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death."  W. Va. Code § 23-4-2(c)(2)(A).  He identifies the condition as follows:

> The specific unsafe working condition at issue for Mr. Beckner existed in his workplace after his annual physical in 1994 when Dr. Avashia learned that Mr. Beckner had peripheral neuropathy, causation unknown, took no action and allowed Mr. Beckner to return to his shift, working with chemicals known to cause peripheral neuropathy.

(Pl.'s Resp. Memo. at 30.)  He notes his "illness was mild [in 1994], and, more probably than not, would not have progressed had he been removed or removed himself from exposure to hexane and MIBK."  (Id.)

Bayer emphasizes that Beckner was not illegally exposed to chemicals.  It also asserts that Dr. Avashia's exercise of medical judgment is not a specific unsafe working condition

contemplated by the statute.  Both arguments miss the mark.

Beckner's claim does not rest on illegal exposure to hexane.  He

instead contends that Bayer, through Dr. Avashia, silently

permitted Beckner, in violation of industry standards, to

continue working with substances, like hexane, known to cause or

contribute to the progressive disease from which he was

suffering.[8]

        Neither is deliberate-intention liability extinguished

by Bayer's position that Dr. Avashia simply exercised "medical

judgment" under the circumstances.  It is unassailable that

routine medical malpractice by a company physician would not

trigger liability under the deliberate-intention statute.

Beckner's allegations, however, go much further.  He contends

that Dr. Avashia "roll[ed] the dice" with his health and safety.

(Pl.'s Resp. at 33).  He claims Dr. Avashia knew -- and

understood the risks -- of allowing him to return to an allegedly

hexane-rich environment and did so anyway.  Indeed, Dr. Avashia

---

[8]The parties dispute the extent to which Beckner was exposed
to hexane and MIBK.  That dispute gives rise to a genuine issue
of material fact.  Beckner testified that he smelled hexane while
working at the plant.  (Beckner May 5, 2006, Depo. at 78,
attached as Ex. U to Def.'s Memo.)  If one detects the odor of
hexane, there is necessarily an exposure exceeding the limit set
by the National Institute for Occupational Safety and Health
("NIOSH").  (Martin Depo. at 196-97, recognizing that the odor
threshold for hexane is 60 parts per million ("ppm"), which is
above the NIOSH exposure limit of 50 ppm.)

16

was aware of the diagnosis of peripheral neuropathy and knew that
hexance could cause it and that Beckner was exposed to hexane in
his work.

There is analogous precedential support for Beckner's
position that liability should attach under the circumstances.
In Millison v. E.I. du Pont de Nemours & Co., 501 A.2d 505 (N.J.
1985), employees who were exposed to asbestos in the workplace
alleged, inter alia, that their employer and its physicians
suppressed the results of periodic physical examinations
revealing the employees' development of asbestos-related
diseases.  The Supreme Court of New Jersey observed as follows:

> [Plaintiffs'] allegations go well beyond failing to
> warn of potentially-dangerous conditions or
> intentionally exposing workers to the risks of disease.
> There is a difference between, on the one hand,
> tolerating in the workplace conditions that will result
> in a certain number of injuries or illnesses, and, on
> the other, actively misleading the employees who have
> already fallen victim to those risks of the workplace.
> An employer's fraudulent concealment of diseases
> already developed is not one of the risks an employee
> should have to assume. Such intentionally-deceitful
> action goes beyond the bargain struck by the
> Compensation Act. . . . [P]laintiffs were deceived --
> or so they charge -- by corporate doctors who held
> themselves out as acting in plaintiffs' best interests.
> The legislature, in passing the Compensation Act, could
> not have intended to insulate such conduct from tort
> liability.

Id. at 516 (emphasis added).

17

While the facts in <u>Millison</u> are not identical, the principles underlying it inform the appropriate outcome here.  In sum, if an employer suppresses the results of a routine work-related medical examination disclosing that its employee is suffering from an occupational disease that may be caused by ongoing workplace exposures, the specific-unsafe-working-condition element may be satisfied.  Inasmuch as the evidentiary record discloses that genuine issues of material fact remain on that point, defendant is not entitled to judgment as a matter of law.

## 2. Subjective Realization

Beckner must next demonstrate "[t]hat the employer had a subjective realization and an appreciation of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition." W. Va. Code § 23-4-2(c)(2)(B).

More is required than simply showing that "the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition."  Syl. pt. 3, <u>Blevins v.</u>

<u>Beckley Magnetite, Inc.</u>, 185 W. Va. 633, 634-35, 408 S.E.2d 385, 386-87 (1991).  Rather, "it must be shown that the employer actually possessed such knowledge."  <u>Id.</u>  Inasmuch as direct state-of-mind evidence is nearly always absent, however, "subjective realization . . . [may] be shown . . . by circumstantial evidence, from which . . . conflicting inferences reasonably can be drawn."  <u>Sias v. W-P Coal Co.</u>, 185 W.Va. 569, 575, 408 S.E.2d 321, 327 (1991).

Bayer asserts that Dr. Avashia was negligent at best in thinking Beckner's disease was of an isolated non-work related nature.  But there exists sufficient circumstantial evidence from which a jury could find that Dr. Avashia "subjectively realized" and "actually possessed" knowledge of a more culpable variety.

In 1994 Dr. Avashia knew that Beckner was working with hexane.  He also knew the compound, especially in concert with the MIBK to which Beckner was exposed, caused peripheral neuropathy.  Dr. Avashia went so far as to testify that a hypothetical worker with the exposure-based form of the disease would be at high risk of serious injury if the exposure continued.

19

Beckner notes as well Dr. Avashia's impressive credentials, his lengthy employment history with Bayer, and the promotions he has received over the years.  He asserts these undisputed facts give rise to a reasonable inference that Dr. Avashia suppressed the disease/exposure link from both Beckner and the plant's industrial hygiene department to avoid birthing plant safety concerns or costly workers' compensation claims.  In support, Beckner notes testimony by Bayer's own expert, Dr. Martin, observing that a chemical company would take a dim view of its physician encouraging workers' compensation claims.

The foregoing evidence and resultant inferences give rise to a genuine issue of material fact respecting the second statutory element.  Bayer is thus not entitled to judgment as a matter of law on the point.

### 3. Violation of a State or Federal Safety Statute, Rule or Regulation, or of a Commonly Accepted and Well-Known Safety Standard

The third statutory element requires proof by a preponderance of the evidence that "the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation . . . or of a commonly accepted and well-known safety standard within the industry or business of the employer .

20

. . ." W. Va. Code § 23-4-2(c)(2)(C).  The statute does not condemn the transgression of general safety standards.  Instead, Beckner must identify a "statute, rule, regulation or standard . . . specifically applicable to the particular work and working condition involved . . . ."  Id. (emphasis added).

In Mayles v. Shoney's, Inc., 185 W. Va. 88, 95, 405 S.E.2d 15, 22 (1990), the supreme court of appeals concluded that the third statutory element was satisfied by expert testimony concerning employer industry standard violations.  Beckner has chosen the same approach.  He has designated Dr. Welch to testify that Dr. Avashia's conduct created a specific unsafe working condition that violated a well-known safety standard.  Dr. Welch will further testify that Dr. Avashia, and hence Bayer, violated commonly accepted and well-known safety standards governing company physicians who periodically examine chemical industry workers.  Dr. Welch appears particularly concerned about Dr. Avashia's (1) failure to advise Beckner his disease could have resulted from hexane exposure, and (2) avoidance of any investigative actions designed to help properly source Beckner's affliction.

The standards referenced by Dr. Welch are quite specific.  Her testimony suffices under Mayle to create a genuine issue of material fact respecting the third statutory element.

21

### 4. Intentional Exposure

It is next incumbent upon Beckner to prove that Bayer intentionally exposed him to the specific unsafe working condition.  Bayer asserts that there is no evidence it tasked Beckner with continuing work in a hazardous setting "with conscious awareness of the unsafe working condition . . . ." (Def.'s Memo. at 31.)  Bayer's expert Dr. Martin says that Dr. Avashia's failure to request industrial hygiene information "can at worst be described as complacency based on his belief that there was no excessive exposure and that if excessive exposures had occurred these would have been reported to him." (Martin Report at 10, attached as Ex. Q to Def.'s Memo.)  Dr. Martin appears to concede, however, that Dr. Avashia should have obtained the information respecting the degree of Beckner's exposure following notice of his diagnosis.

In any event, Dr. Martin's opinions represent selective inferences based upon a vast evidentiary record.  The inferences drawn by Beckner and his experts from that same mountain of conflicting proof are entirely different.  This fact-bound conflict precludes judgment as a matter of law respecting the

22

intentional-exposure element.  Based upon the foregoing, the court concludes that Bayer is not entitled to summary judgment on Beckner's deliberate-intention claim.[9]


                              III.


        In view of the foregoing, it is ORDERED that defendant's motion for summary judgment be, and it hereby is, denied.

        The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

                         DATED: March 2, 2011

                         _____
                         John T. Copenhaver, Jr.
                         United States District Judge


_____

        [9]Bayer does not seek summary judgment respecting the fifth statutory element.

                              23